RANDY S. GROSSMAN
United States Attorney
ALLISON B. MURRAY
California Bar No. 328814
Special Assistant U.S. Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9711
Email: Allison.Murray@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| UNITED STATES OF AMERICA, | Case No.: 21-CR-2294-JLS |
|---|---|
| Plaintiff, | **UNITED STATES' OMNIBUS SENTENCING MEMORANDUM** |
| v. | |
| JAINER SARAZAR (1)<br>ALDEMAR MOSQUERA GARCES (2)<br>OCTAVIO PORTOCARRERO ACHITO (3)<br>PEDRO JOSE MENA FLORES (4), | Date: November 10, 2022<br>Time: 9:00 a.m. |
| Defendants. | |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Allison B. Murray, Special Assistant United States Attorney, hereby files this Sentencing Memorandum as to the following defendants: Jainer Sarazar (D1), Aldemar Mosquerra Garces (D2), Octavio Portocarrero Achito (D3), and Pedro Jose Mena Flores (D4). This memorandum is based upon the files and records of the case.

**I.   INTRODUCTION**

Defendants Jainer Sarazar (D1), Aldemar Mosquerra Garces (D2), Octavio Portocarrero Achito (D3), and Pedro Jose Mena Flores (D4) are before the Court for

sentencing after pleading guilty to 46 U.S.C. § 70503, Possession of Cocaine with Intent to Distribute on Board a Vessel and 18 U.S.C. § 2, Aiding and Abetting.

When defendants departed Colombia on their drug-laden go-fast vessel, the seas were calm. With two-foot swells out of the southwest and only a slight chop, it was easy for defendants to proceed at speed. It should have been easy money. Hours later, however, the weather took a turn for the worse. Wind speeds kicked up and swells shifted direction and rose in height. Sea waves heightened too. Before long, the defendants were experiencing sustained winds of 20 knots and seas of nearly seven feet. Despite the worsening conditions, the defendants were prepared. As seasoned fishermen, each had undoubtedly experienced rough weather at sea before.

A substantial sentence is warranted here. Unlike couriering drugs in a vehicle across the border, maritime cocaine smuggling is complicated and demands special skill. The expertise necessary to transport cocaine on the high seas is significant. With so many variables to contend with, including weather, sea state, mechanical casualties, sickness, etc., drug trafficking organizations hire confident and trusted crew. This crew was no different. With over $22 million dollars in illicit cargo on the line, each member performed an essential and necessary role. As a result, the defendants would be handsomely compensated. However, as these defendants undoubtedly learned from their shortened voyage—after their go-fast vessel took on water and capsized—transporting cocaine on the high seas is dangerous and potentially deadly work. Mishaps happen. And what began as a voluntary drug smuggling assignment resulted in a maritime emergency and the defendants' fortuitous rescue by the U.S. Coast Guard. They are lucky to be alive.

The United States recommends 84 months custody, followed by 5 years of supervised release, no fine, and a $100 special assessment. This reflects the seriousness of the offense, including the level of skill and preparation required to transport approximately 1,269 kilograms of cocaine on the high seas, and the remaining 3553(a) factors.

//

## II. STATEMENT OF FACTS

### A. The Crime

On July 21, 2021, a Coast Guard helicopter detected a capsized vessel dead in the water approximately 58 nautical miles southeast of Isla de Malpelo, Colombia in international waters. The go-fast vessel was overturned, approximately 30 feet in length, with a white hull and four persons sitting on the keel wearing lifejackets. The helicopter crew dropped a strobe light to mark the vessel's position and observed numerous packages in the water that appeared to be tied to the overturned vessel.

 

United States Coast Guard Cutter ("USCGC") MOHAWK was nearby and launched a small boat with an embarked boarding team to intercept the vessel and perform search-and-rescue. Due to the sharp angle of the hull, sea state, and packages and line in the water, the Coast Guard rescue team decided the best course of action for recovery was to throw a life ring attached to a heaving line towards the vessel and retrieve each passenger individually.



One at a time, the defendants disembarked the go-fast vessel, grabbed ahold of the life ring and were pulled to safety by the Coast Guard crew. Once on board, officers conducted a health assessment of each defendant and confirmed that they were physically healthy and coherent. They were cold, thirsty, and hungry. The defendants reported that they had been floating in that position for hours before their rescue. The cause of the capsize was reported to be an engine failure at speed and in rough seas that caused the bow to nose-dive and fill with water.

With recovery of personnel complete, the Coast Guard completed Right of Visit questioning. The master of the vessel, D1 Jainer Sarazar, made a claim of Colombian






nationality for the vessel. Following forms exchange with Colombia, it was treated as without nationality and a full law enforcement boarding commenced. Officers located 31 bales of cocaine tied to the vessel at an approximate weight of 1,269 kilograms (2,797 pounds). In addition, a white bucket containing 16 bricks of marijuana with an at-sea weight of 16 kgs (52 pounds) was present.

Defendants provided various explanations for how they became involved in this drug trafficking event and their actions. Ultimately, agents discovered Sarazar (D1), Mosquerra Garces (D2), Portocarrero Achito (D3), and Mena Flores (D4) left on a drug laden go-fast vessel from Colombia approximately 32 hours before they were interdicted by the Coast Guard. They intended to rendez-vous with another drug smuggling vessel at sea near Isla de Malpelo but capsized before reaching their destination. The defendants floated on the capsized vessel for approximately 16 hours before rescue. Prior to the vessel's capsize, the defendants worked together as a team to transport the cocaine from Colombia. Though Jainer Sarazar (D1) identified himself as the person in charge or captain of the vessel, each

crewmember performed an instrumental function while on board, including navigation, communications, and maintaining the engines, fuel, and water pumps. Sarazar (D1) was primarily responsible for navigation and communications with smugglers on shore. Mosquera Garces (D2) was responsible for putting fuel in the tanks to keep the engines running. Portocarrero Achito (D3), an experienced fisherman, also helped navigate and performed odd jobs such as tying things and moving stuff. Finally, Mena Flores (D4) served as a mechanic, operating and maintaining the motor and monitoring hoses for the pump.

**B.     Defendant's Statements**

Defendants told the Coast Guard that the purpose of their voyage was to "transport the packages" while pointing to the packages of cocaine attached to the overturned vessel. Each of the defendants admitted to the factual basis of the plea agreement in their presentence interviews. They understood the scope of their responsibilities and admitted that they were financially motivated in their actions.

**III.    THE GUIDELINES**

**A.     Calculation**

Under U.S.S.G. § 2D1.1 (c)(1), the base offense level is 38. The United States is not recommending any enhancements or any reductions for role. There is a three-level downward departure for acceptance of responsibility. Each of the defendants have satisfied the fifth prong of U.S.S.G. § 5C1.2(a)(5) to receive a two-level reduction for Safety Valve. Each of the defendants are in Criminal History Category I per their respective PSRs. The resulting guideline range is 135 to 168 months in custody. Pursuant to the plea agreement, the United States recommends that the Court impose 84 months custody, which is a substantial variance of 51 months from the low end of the guideline range. The Court should decline to impose any further variance, as that would create an unwarranted sentencing disparity between similarly situated defendants and would not promote respect for the law.

### B. Government Recommendation

Several factors justify the Government's recommendation.

First, each of the defendants negotiated with the Government in their respective plea agreements that we would recommend 84 months custody, a significant variance, so long as the defendant qualified for Safety Valve. The Government's recommendation is in furtherance of these agreements.

Second, the nature and circumstances of the offense support the Government's recommendation. Each of the defendants pled guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel and Aiding and Abetting. The evidence demonstrates that the defendants coordinated an at sea voyage spanning over a hundred nautical miles to transport a vast sum of cocaine valued at over $20 million US dollars. Transporting cocaine on the high seas takes considerable skill and experience – most especially in rough seas as was the case here. That skill promised significant financial reward.

The sophistication of carrying out the present offense similarly influences the Government's recommendation. Maritime drug smuggling is a complex undertaking—a venture for which the defendants' preparation, expertise, trustworthiness, and efforts were critical. Each of the defendants acted as more than mere drug couriers which this district often encounters for sentencing in land-based drug smuggling ventures. Instead, maritime smuggling requires specialized skills that men like the defendants—each experienced mariners—are specifically suited for because of their familiarity with the maritime environment and their surety in carrying out the job. A prudent drug smuggler would not entrust nearly 1,269 kgs of precious cargo to an unskilled, untested mariner. Nothing of the sort. The fact that the defendants here failed to complete their mission due to a maritime emergency does not change this. Instead, it broadly speaks to the extraordinary skill involved in maritime smuggling and serves to further distinguish these cases from routine "border busts." The risk involved in transporting narcotics on the high seas, the significant length of time it takes, the remoteness of the route (without a safe or reliable means of

rescue), and the plethora of potential catastrophes that can occur on the open ocean—problems defendants are expected to solve on their own—requires smartly trained men. Each of the defendants possess talents rare among everyday persons.

The United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate in this case. The defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense. *United States v. Dominguez-Caicedo*, 40 F.4th 938, 964-66 (9th Cir. 2022) (noting that the relevant comparators are the *actual* participants in the defendant's crime—not that of every hypothetical member of a typical drug trafficking organization). Although each of the defendants will attempt to minimize their respective role to achieve a reduction in sentence, the bottom line is that to operate a 30-foot panga, loaded with drugs, in rough seas, each of the defendants played a critical role in what can only be described as a complex, extended *team* evolution. The nature and extent of each defendant's participation and the decision-making authority the defendants retained while alone at sea weighs against a minor role adjustment. The defendants were paid or expected to receive substantial sums to transport drugs for a reason. They were trusted. The defendants operated as equals, utilizing tremendous skill, training, and acumen as discussed. They took turns manning the helm. They assisted one another with refueling. They collectively responded to the flooding emergency. Decision-making authority was shared. They were literally stuck in the same boat, and all were critical and equally culpable for its voyage. Even including a recruiter in the Court's calculation of participants, none of the defendants were *substantially* less culpable than any of the others. None were substantially less culpable than the average participant. Without any of the defendant's doing their job, the panga would not have been able to sail as efficiently or effectively. It would not have made it as far as it did. The amount of cocaine involved in this offense, the comparatively substantial sum that each defendant expected to receive, and the preparatory steps taken by the defendants to seek employment on this vessel weigh against a role reduction.

Likewise, the sheer quantity of cocaine found on board defendant's vessel supports the Government's recommendation. The defendants were responsible for trafficking an astounding amount of cocaine. To put it in perspective, this was over 195 times the amount of cocaine required for a ten-year mandatory minimum, and more than twice the amount of cocaine that establishes the highest possible base offense level in the sentencing guidelines. During a maritime drug smuggling venture the value of the drugs, and potential profit, increases exponentially as it is transported from the littorals of Colombia north to Central and North America. Had this cocaine successfully made it to the United States it would have been worth well over $22 million dollars. There is no doubt that if this highly dangerous drug successfully made it to the United States it would have led to extensive harm.

Given the need to generally deter others from similar maritime drug smuggling schemes, it is essential the sentence reflects the seriousness of this offense and the potential harm from trafficking cocaine on the high seas. The defendants in this case have a second chance at life. Rescued by the Coast Guard, they hopefully learned after floating on the open ocean for 16 hours that the dangers of drug trafficking do not outweigh the appeal of earning a quick buck through illicit means. But general deterrence is key here too. Only a significant sentence will discourage future potential traffickers from engaging in similar crimes for the substantial profit that maritime smuggling promises. The incentive to make relatively large sums of money for trafficking drugs—especially given the incredibly low odds of detection in the open ocean—must be combated with the deterrence of significant sentences for engaging in this criminal activity.

Finally, the substantial variance already recommended by the United States appropriately recognizes the 3553(a) factors unique to each defendant, including health, education, age, and family circumstances. This Court should not vary downward any further.

//

## IV. CONCLUSION

Based on the 3553(a) factors, a custodial sentence of 84 months, followed by 5 years' supervised release, no fine, and a $100 special assessment is appropriate.

DATED: November 3, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Allison B. Murray*
ALLISON B. MURRAY
Special Assistant U.S. Attorney